OPINION
Defendant-appellant, Edward J. Urban, D.O. ("defendant" or "Dr. Urban"), appeals the judgment of the Franklin County Court of Common Pleas following a criminal trial in which he was found guilty of Medicaid fraud and tampering with evidence. The trial court denied defendant's motion for new trial after a post-trial hearing, and then entered judgment on the verdict.
Dr. Urban operated a medical office in Cortland, Ohio, treating Medicaid patients and billing the Ohio Department of Human Services ("ODHS") for these services. He employed other physicians at times and hired temporary physicians when he went on vacation. Dr. Urban's facilities included an on-site laboratory and radiology unit, and he employed laboratory technicians. He also employed a licensed practical nurse ("LPN") who performed gynecological examinations, which he billed to Medicaid.
In 1996, the State Medical Board of Ohio ("medical board") subpoenaed Dr. Urban's charts and files, at which time Dr. Urban retained attorney Kenneth Bravo to represent him. Documents were then subpoenaed by the Franklin County Grand Jury. Although Dr. Urban produced the requested documents, he wrote in them and inserted additional material into progress notes that had been made at the time of the patients' examinations. Some of these examinations had taken place years before.
Dr. Urban was indicted by the Grand Jury on multiple counts of felony Medicaid fraud under R.C. 2913.40(B). The fraud charges were twofold: billing for tests that were not medically necessary, and billing for services provided by an LPN that were not payable under Medicaid unless provided by a physician, registered nurse, or physician's assistant. Dr. Urban was also indicted for tampering with evidence in violation of R.C. 2921.12(A).
Dr. Urban hired a new attorney, Paul Coval, who represented him during plea bargaining. Dr. Urban pled guilty but then withdrew his plea. He then retained attorney Mark Colucci.
Defense counsel filed a pretrial motion to sever the trials of Dr. Urban and Sharon Hatcher, his billing clerk. The trial court denied severance, and trial proceeded in September 2000, with Tim Merkle defending Ms. Hatcher.
The jury found Dr. Urban guilty of two counts of felony Medicaid fraud, one misdemeanor fraud count, and two counts of tampering with evidence. The jury acquitted him of double billing for thyroid tests.
Mr. Colucci filed a motion for new trial. Dr. Urban then hired a new attorney, William Kluge. On November 9, 2000, a hearing was held before the trial court. According to the transcript, the court was considering sentencing issues as well as the motion for new trial, and wanted to have a better understanding of what types of conduct a doctor would reasonably believe were acceptable as opposed to conduct that would constitute fraud or tampering. The court heard testimony from Dr. Robert M. Taylor, an expert who addressed standards for medical charts.
Dr. Taylor testified that adding new information to an old note constitutes an alteration of the chart because progress notes are meant to be a contemporaneous record written at the time of the event. He explained that altering a note years later would hardly be an improvement on accuracy. He explained that, although a doctor can properly write an addendum in the present that refers to and clarifies the past, it is absolutely improper to insert new statements into an old note without indicating the date and writer. Dr. Taylor testified that such a note is a misrepresentation, giving a false impression that the doctor was thinking that way at the time of the examination and wrote it down then. He also testified regarding testing protocols and holistic medicine.
At the close of the November 2000 hearing, Mr. Kluge asked for an extension of time to file additional evidence in support of defendant's motion for new trial. He urged the court not to enter judgment until new evidence was presented, given that judgment could involve closing the doctor's office and putting the staff out of work. The court granted leave to supplement the motion and expressly invited the defense to present an expert witness to demonstrate that Dr. Urban's practices were within the range of what a reasonable physician would do.
On December 4, 2000, Dr. Urban filed a motion for new trial, arguing inter alia that trial counsel was constitutionally ineffective and that the state did not prove guilt beyond a reasonable doubt. In regard to whether he altered evidence, Dr. Urban argued that he did not change the charts but only made them complete. Further, he contended that the evidence of tampering was insufficient because there was no proof that his additions to the charts actually impeded the investigation.
In support of his claim of ineffective assistance of counsel, Dr. Urban filed affidavits from his wife, himself, and several employees. Dr. Urban admitted that he added to the documents before producing them but alleged that he was merely "grooming" the files in a manner he believed was acceptable. He alleged that Mr. Bravo instructed him to make a complete chart and then copy it. He stated that he updated and added to the charts on advice of counsel. He asserted that Mr. Bravo told him that "[t]his is a criminal investigation, you do things differently." He further alleged that witnesses would have testified that the attorney advised Dr. Urban to continue grooming the files.
In addition, Dr. Urban selected three patient files and asserted in his affidavit that many of the tests could have been justified as medically necessary if the patient's whole history and the treatment philosophy had been presented at trial. He contended that Mr. Colucci failed to call him to testify as to these matters. In regard to billing for gynecological examinations by an LPN, he submitted two policy statements from the medical board, asserting that they supported his defense that he billed for the LPN's services in good faith. He argued that his trial counsel failed to present these defenses.
Dr. Urban's wife, in her affidavit, alleged inter alia that her husband told Mr. Bravo that records were being brought up to date and otherwise added to, and that Mr. Bravo approved. Several of Dr. Urban's employees provided similar affidavits that Mr. Bravo was told that records were being updated and added to, which was referred to as "grooming" the charts, and that the attorney told Dr. Urban he could continue.
On January 19, 2001, a hearing was held. Mr. Bravo testified upon limited waiver of the attorney-client privilege, answering questions about the allegations in the post-trial affidavits. He testified about the numerous subpoenas, explaining that Dr. Urban said he could not produce the documents all at once because he needed them to treat patients. Also, many records were computerized, but the subpoena did not require production of the entire database. Therefore, Mr. Bravo negotiated an agreement under which, for each patient whose records were subpoenaed, Dr. Urban would print out the computer records and place a copy of the computer records for each patient into his or her file. Thus, there would be a packet for each patient.
According to Mr. Bravo, Dr. Urban also expressed concern about papers filed incorrectly and that he did not want to disclose information inadvertently about patients whose files were not subpoenaed. Accordingly, Mr. Bravo arranged that the files would be produced over a period of time to permit Dr. Urban's office to print out and copy the computer records, combine them with the patient charts, and review the patient files to remove any other patient's documents.
Mr. Bravo testified that he did not use the term "grooming" files, that it was "not a term that would be in my vocabulary and not a term that I would use." (Tr. 2204.) He explained that, if Dr. Urban used that term, it was in the context of making sure the right pieces of paper were in each file. Mr. Bravo testified that he never had a discussion with Dr. Urban about making changes or additions to existing documents. He stated unequivocally that he never advised Dr. Urban that he could groom files to make them "complete" by adding to office notes after the date of the visit.
In regard to the allegation that staff members and Mrs. Urban heard him confirm that Dr. Urban could groom the files, Mr. Bravo testified that, on the occasions he was with Dr. Urban in the presence of staff members or Mrs. Urban, the document production was complete or nearly so. He noted, however, that Dr. Urban was very upset about the production of the files and often talked with counsel about it. He noted that, to the extent he approved continued preparation of files, he meant adding the computer printouts and removing misfiled papers.
As to the statement about doing things differently in a criminal investigation, Mr. Bravo testified that he was explaining why a quick settlement was unlikely. He narrated how Dr. Urban expected the subpoena process to be like previous Medicaid audits in which auditors reviewed files, stated an overpayment, negotiated a settlement with his attorney, and he wrote a check and the thing went away. Dr. Urban wanted that to happen in this case. Mr. Bravo said he explained that this was a criminal investigation and things were done differently. He told Dr. Urban repeatedly that, because a grand jury was involved, they could not negotiate a quick settlement and write a check. Mr. Bravo further recalled that he and Dr. Urban discussed what Medicaid fraud was and what the potential penalties were, but that Dr. Urban never told him that he was writing new statements into old charts.
Following Mr. Bravo's testimony, Mr. Kluge indicated he had no witnesses, and there was extensive oral argument on the motion for new trial, including the issue of ineffective assistance of counsel. The trial court denied the motion for new trial, and, on January 25, 2001, entered judgment on the verdict. The court sentenced Dr. Urban to suspended sentences for the felony convictions of fraud. The court imposed a fine, community service, restitution, and costs. In regard to tampering with evidence, the court sentenced defendant to one year of incarceration on each count to run concurrently, and imposed a fine.
Defendant filed the present appeal, assigning the following errors:
 [1.] THE DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION AND ARTICLE I
SECTION 10 OF THE OHIO CONSTITUTION DUE TO THE ACTS AND OMISSIONS OF HIS ATTORNEY AT TRIAL.
 [2.] THE TRIAL COURT ERRED IN NOT SUSTAINING TRIAL COUNSEL'S OBJECTION TO TESTIMONY GIVEN BY STATE WITNESS COOPER.
 [3.] THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT URBAN'S MOTION FOR SEVERANCE.
 [4.] THE TRIAL COURT COMMITTED PLAIN ERROR BY ALLOWING THE ADMISSION OF INADMISSIBLE HEARSAY.
 [5.] THE STATE FAILED TO PROVE THE ELEMENTS OF MEDICAID FRAUD BEYOND A REASONABLE DOUBT.
 [6.] THE STATE FAILED TO PROVE THE ELEMENTS OF TAMPERING WITH EVIDENCE BEYOND A REASONABLE DOUBT.
We begin our review with the fifth and sixth assignments of error, in which defendant contends that the state failed to prove the elements of Medicaid fraud and evidence tampering beyond a reasonable doubt. This contention is essentially a challenge to the sufficiency of the evidence.
In State v. Martin (Apr. 19, 2001), Franklin App. No. 00AP-836, unreported, this court recently reiterated the standard of review:
 * * * In determining the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." [Id., citing State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.]
In the present appeal, we conclude that there was sufficient evidence on which the jury could find defendant guilty of the crimes beyond a reasonable doubt. Further, the trial court did not abuse its discretion in denying a new trial on the grounds that the state failed to adduce sufficient evidence to convict defendant.
During the trial, the prosecution presented evidence that Dr. Urban billed under Medicaid for tests performed at his laboratory that were not ordered by the doctor who examined the patient at the time the tests were ordered. Multiple witnesses, including doctors and staff, testified that lab tests were routinely ordered by an LPN or medical assistant prior to the medical examination. Further, there was testimony that Dr. Urban and his staff made additions to charts written by the temporary doctors, adding diagnoses and other information to support tests ordered by the staff.
Cathy Fabian, an LPN, testified that Dr. Urban had a written protocol for the office, under which she and other staff members were instructed to order an array of tests as a routine matter before patients were examined by the doctor. For example, under the protocol, if a patient said he had chest pain, the staff automatically ordered a chest x-ray, an electrocardiogram, and pulmonary function tests. Five doctors who had worked for Dr. Urban — Drs. Trieber, Korn, Blesch, Cooper and Barnovsky (four temporary doctors and one who was employed for several months) testified regarding Dr. Urban's practice of having his staff order an array of tests prior to a patient being seen by the examining doctor. These doctors testified that they did not make a finding of medical necessity and did not authorize the tests that were ordered on the day of their examination. They testified that, in many cases, they were not even aware the tests had been ordered. Several of the doctors testified that tests routinely ordered by the staff were not medically necessary. One of the temporary doctors, Dr. Cooper, testified that she finally told the staff that she would be responsible only for tests that she ordered herself. She explained that diagnoses were being written in the charts by staff members to justify tests that, in her opinion, were not necessary and had no relevance to the particular office visit where she was in charge. We conclude that the evidence presented at trial, if believed, was sufficient to convict Dr. Urban of Medicaid fraud in regard to billing for tests for which a finding of medical necessity had not been made.
In addition, there was substantial evidence that Dr. Urban billed Medicaid for medical procedures performed by Ms. Fabian, an LPN, despite the fact that Medicaid regulations plainly stated that these procedures were payable only when performed by a registered nurse, physician's assistant, or physician. Ms. Fabian testified that Dr. Urban asked her to perform gynecological examinations and pap tests. She testified that he showed her a regulation that, he asserted, allowed nurses to perform such examinations. However, the regulation stated that services provided by a "registered nurse" could be paid under Medicaid. Ms. Fabian testified that, when she asked Dr. Urban about that language in the regulation, he said that she could do the tests under the direction of a physician. When she asked about the billing code, which indicated that the procedure was done by a registered nurse, he responded that it did not matter. There was substantial evidence that Ms. Fabian performed many of these procedures and that Dr. Urban billed Medicaid using a code that he knew was for services provided by a registered nurse or physician's assistant. The evidence, if believed, supported a finding that Dr. Urban intentionally billed for an LPN's services, representing that the services were performed by a registered nurse or physician's assistant.
On appeal, Dr. Urban argues that there was evidence showing that he was not guilty. For example, he emphasizes admissions made by the doctor-witnesses that they were testifying as to one visit in isolation and were not familiar with the patient's entire medical history, and admissions that doctors may disagree as to what is medically necessary. Such arguments, however, go to the weight of the evidence, not its sufficiency.
Further, the fact that doctors may differ as to medical necessity did not negate an element of proof. The key to the prosecution's case was not that Dr. Urban ordered more tests for his patients than other doctors ordered for their patients. Rather, the prosecution theory was that arrays of tests were routinely performed in the absence of a doctor's finding of medical necessity, and that this came to light when visiting doctors were examining patients and learned that tests were performed that they had not ordered. The prosecution relied on the doctors' testimonies that tests were performed without their having made a finding that the tests were medically necessary, and that, in many cases, they found the tests unnecessary. In addition, Ms. Fabian and others testified that the staff would add diagnoses to patient charts for patients that had been seen by doctors other than Dr. Urban. In sum, although the jury could view the admissions as weakening aspects of the prosecution's case, the evidence was nonetheless sufficient to support a guilty verdict.
As to tampering with evidence, we also find sufficient evidence to convict. A forensic expert testified that the charts had been altered in Dr. Urban's handwriting. Indeed, Dr. Urban does not deny that he added new material to patient charts after they were subpoenaed. Rather, he stated that he did not know it was wrong and that his actions did not actually hamper the investigation.
We acknowledge that there was trial testimony that Dr. Urban wrote openly in the charts, in plain view of anyone who would walk by, and that, when asked about it, he explained that his lawyer told him he was allowed to do it. However, the fact that exculpatory evidence was presented does not mean that the jury was required to believe it. The jury could rely on the following evidence of tampering, including the sequence of events. First, there was substantial evidence of billing irregularities, including billing of LPN services under a code for registered nurses or physician's assistants and evidence of billing for unnecessary tests. Then there was evidence that patient charts were subpoenaed, after which Dr. Urban personally reviewed the files and altered most of them. Charts showed additions of a type that could be viewed as an attempt to justify testing and billing. The jury could reasonably find that Dr. Urban altered the documents by adding to them. The jury could reasonably infer a motive to deceive and could find defendant guilty beyond a reasonable doubt of tampering with the evidence. In addition, Dr. Urban cites no authority for the proposition that the prosecution, to obtain a conviction, must prove that defendant rendered the evidence useless or was otherwise successful in hindering the investigation. We overrule defendant's fifth and sixth assignments of error.
We next address the second assignment of error, in which defendant asserts that the trial court erred in failing to sustain an objection to testimony from Dr. Cooper, one of the temporary doctors employed by Dr. Urban. Dr. Cooper testified that diagnosis codes and tests were added to her office notes, but that she did not order the tests or state the diagnosis code used to justify the tests. She explained that Ms. Hatcher would come to her and ask what diagnosis code to use for the tests, and that it was difficult to answer because she had not ordered them. Dr. Cooper testified that, most of the time, she refused to provide a diagnosis code because she did not order the tests and did not have a justification for them, such as routinely ordering an EKG for a woman who just had a baby. Dr. Cooper explained that the problem was not a difference of opinion with Dr. Urban about preventive medicine for patients he examined, but that the tests were ordered by the staff for patients that she, Dr. Cooper, was examining. Further, Dr. Cooper stated that the staff ordering tests "had no clue what they were doing." (Tr. 517.) She explained that she understood periodic tests for cholesterol or chest x-rays for a smoker, but stated there was no basis for these tests:
 * * * [T]here was no rhyme or reason to it. They just showed up in the charts. And when I saw the patient I didn't order them. * * *
 And when I queried the staff about it, they didn't understand the rationale behind ordering what they were ordering, and that's a big concern * * *. [Tr. 515.]
Dr. Cooper explained that, if a doctor had a reason for ordering an EKG for a new mother, she could accept that, but Dr. Urban was not ordering these tests, his staff was.
When asked if she ever confronted Ms. Hatcher, the billing clerk, about the adding of diagnosis codes to the charts, Dr. Cooper answered that, by the end of her first week in the office, she was expressing concerns about tests being ordered, including a conversation in which she expressed to a staff member her fear of liability: "I said we were all going to jail if we weren't careful." (Tr. 491.) Mr. Merkle objected, explaining in a sidebar conference that the testimony did not indicate whether the particular statement was made to Ms. Hatcher or someone else. Mr. Merkle requested that questions be directed to what the witness said to Ms. Hatcher and that the witness put it in a timeframe. Mr. Colucci joined in the objection, after which Mr. Merkle proceeded to raise a separate issue, which was discussed at length. The court agreed that a special instruction would be given regarding the latter objection, but the court did not make an explicit ruling regarding the former objection. For the purposes of this appeal, we assume the objection was overruled.
On cross-examination, Mr. Colucci then elicited admissions from Dr. Cooper, including the following: that she was not an expert in determining under Medicaid law what tests are "medically necessary"; that she did not have legal training; that she never filed a complaint with the medical board based on anything she saw in Dr. Urban's office; that she never contacted a law enforcement agency regarding anything she observed in the office; that she earned $2,000 per week while working for Dr. Urban; that she came in and saw patients and took her $2,000 and did not get involved in billing; that she had been a licensed physician for only a year when she came to work for Dr. Urban; that Dr. Urban had been in practice for more than twelve years and had more experience in examining and diagnosing patients than she did; that doctors can have differences of opinion on what a patient needs; that not all general practitioners run their offices the same way; that Dr. Urban had known some of the patients for many years and could know things about them that Dr. Cooper did not know; and that her role in the trial was not to decide what was "medically necessary" but to verify what she did and did not do in the office, what she saw, and so forth. Mr. Colucci asked for a cautionary instruction that Dr. Cooper was not presented as an expert witness, which the court refused. Mr. Colucci then elicited further testimony that Dr. Cooper was not in court to give expert testimony as to what was medically necessary under the Medicaid statute, and she further admitted that she did not know what conduct was criminal under the statute.
We conclude that, because the witness herself admitted repeatedly that she was not an expert on Medicaid law, the trial court was not required to tell the jury that she was not an expert witness on that topic. We also conclude, in regard to her testimony regarding her concerns about the office practices, that the trial court was within its discretion to overrule the objection. Dr. Cooper's testimony was not within the definition of hearsay because it was not offered to prove the truth of the statement. That is, her statement was not presented to prove the criminality (or potential criminality) of what Dr. Cooper and the staff were doing. Dr. Cooper repeatedly admitted she did not know what was criminal under Medicaid statutes. Her testimony was presented to show that Ms. Hatcher was informed of Dr. Cooper's reasons for refusing to follow the usual protocol, not to show that Dr. Cooper's conduct (or the staff's conduct) was actually criminal. Regardless of whether her fear was misguided or valid, the point was whether Dr. Cooper expressed the fear to Ms. Hatcher, not whether it was true. We overrule defendant's second assignment of error.
In his third assignment of error, defendant contends that the trial court abused its discretion in denying severance of his trial. However, defendant had the burden of proving good cause for severance. Not only does joinder conserve judicial time, lessen the expense of multiple trials, and diminish inconvenience to witnesses, but it also minimizes the potential for incongruous results in successive trials. State v. Thomas (1980), 61 Ohio St.2d 223.
Dr. Urban argues that, in a joint trial, Ms. Hatcher's only defense was to present herself as a dupe and attack her benevolent employer. He also argues that evidence against her was presented to his prejudice, and that Mr. Merkle objected to some of Mr. Colucci's questions. These arguments are unpersuasive. Ms. Hatcher chose not to testify. She did not say she was an innocent dupe and did not attack Dr. Urban. Also, it is not correct that Ms. Hatcher had only one defense. One of her theories was that, while there may have been mistakes and misunderstandings as to billing under Medicaid, there was no intent to defraud. In fact, this defense was successful for both defendants on the charges of double-billing for thyroid tests. In addition, although it is true that some of the evidence applied to one defendant and not the other, the evidence was not so confusing that the jury could not understand which evidence was applicable to Ms. Hatcher and which applied to Dr. Urban. Mr. Merkle told the jury that some evidence applied only to one defendant and not to the other, which was appropriate. Although Dr. Urban asserts that he was prejudiced because Mr. Merkle objected to questions by Mr. Colucci, the court provided a lengthy instruction to the jury as to why it must disregard who made the objections and why they were made. This instruction adequately cured any prejudice. We overrule defendant's third assignment of error.
Defendant's fourth assignment of error states that the trial court committed error by admitting summaries of Medicaid bills and/or payments. The documents at issue are "remittance advice statements" generated by ODHS based on information submitted by Dr. Urban's office.
Several witnesses testified as to the doctor's billing process and the ODHS payment process. Jim Matis testified regarding the computer system sold to Dr. Urban to process bills. He testified how the Medicaid codes worked in that system, including how a thyroid test could inadvertently be billed more than once without the error being detected.
Next, Anthony Petras of Quadax, Inc., a medical billing organization, explained how, after Dr. Urban's staff entered information on their computer system, the information was transmitted electronically to Quadax, which processed Medicaid billings pursuant to a contract with ODHS. Quadax would format the information received from Dr. Urban's office, making no changes but merely formatting it as needed by the ODHS computers. According to the witness, Quadax then submitted the information to ODHS on reel-to-reel tape, sending Dr. Urban a copy of all the claims submitted to ODHS. ODHS loaded the information into its system and issued "remittance advice statements" to Dr. Urban. ODHS copied the tapes to microfiche, and the tapes were returned to Quadax. When the tapes were returned, they contained all the data initially submitted plus the payment information, including which services would be paid for which patients. Quadax copied these tapes to microfiche and can produce them.
Curtis Skarloken, a section chief at ODHS in charge of maintaining records, authenticated five binders of "remittance advice reports" generated by ODHS based on information received from Dr. Urban via Quadax. On cross-examination, he said that he did not receive a request to produce the microfiche copies of the tapes, and that microfiche copies were not available for some periods, so that it was not possible to check the remittance advice reports against microfiche copies.
We find no abuse of discretion in admitting the remittance advice reports. These reports were regularly issued by ODHS in the course of paying Dr. Urban and other providers for medical services. The reports were prepared as a routine activity in the conduct of ODHS's regular business. See Evid.R. 803(6). ODHS had an incentive to make sure the remittance reports were accurate to avoid paying too much for the services, and the providers had an incentive to review the reports for accuracy to make sure that ODHS did not pay them too little. Thus, the reports have indicia of trustworthiness.
It is true that, when ODHS issued the reports and remitted the payments to Dr. Urban, personal knowledge of the underlying information was in the possession of Dr. Urban's office, not ODHS or Quadax. Indeed, ODHS necessarily relied on the information transmitted from providers. Thus, Dr. Urban's office was in a position to detect any inaccuracies in these reports as they were received from ODHS. Based on the nature of these reports and the indicia of trustworthiness, we find that the trial court did not abuse its discretion, or err, in admitting them. We overrule the fourth assignment of error.
Last, we address the first assignment of error, whether defendant was denied effective assistance of counsel. In order to prevail on that claim, defendant must meet a two-pronged standard. First, he must demonstrate that his counsel's performance was deficient and that counsel's errors were so serious that he was denied his Sixth Amendment right to counsel. Strickland v. Washington (1984), 466 U.S. 668, 687. Second, defendant must demonstrate that, but for counsel's errors, the outcome probably would have been different, that it is reasonably likely that the jury would have rendered a different verdict absent the errors. Id.; State v. Bradley (1989), 42 Ohio St.3d 136, 142. The fundamental question is whether counsel's conduct undermined the trial process to an extent that the trial cannot be relied upon as having produced a just result. Id. at 143.
Dr. Urban raises numerous instances of alleged ineffective assistance of counsel. We have reviewed each of them, and we conclude that, although there were flaws in counsel's representation, defendant has not proved both prongs of Strickland.
In his appellate brief, Dr. Urban repeatedly argues that trial counsel was deficient in failing to call him to testify on his own behalf. Dr. Urban insists that, if he could have explained about his preventive and holistic approach to medicine, and if he could have explained how Mr. Bravo advised him to update the files, the outcome of the trial would have been different. He insists that, if given the opportunity, he could have explained how all the tests billed under Medicaid were medically necessary.
However, there were good reasons to refrain from calling Dr. Urban as a witness. The prosecutor pointed out during hearing on the motion for new trial that, if Dr. Urban had testified that Mr. Bravo told him it was acceptable to insert new material into the progress notes, Mr. Bravo would have contradicted it emphatically, creating a situation where defendant's former attorney essentially called him a liar, under oath. In addition, the prosecutor pointed out that retrospective justifications for some of the tests would not have refuted the central thrust of the prosecution's case, which was that unqualified employees routinely ordered tests under a written protocol prior to examination by temporary doctors, and that tests were thus performed and billed in the absence of findings of medical necessity. Most importantly, the trial court noted that the prosecution had damaging evidence, a statement by Dr. Urban that could be viewed in the nature of a confession, which the prosecution could present to the jury only if Dr. Urban testified, to impeach him.
Although Dr. Urban argues that the jury did not hear crucial evidence because he did not testify, the record reveals that much of this evidence came from other witnesses. For example, although Dr. Urban argues that he did not have the opportunity to explain the role of preventive testing in a holistic approach to medicine, defense counsel cross-examined witnesses about differing opinions on this approach, and obtained helpful admissions from several witnesses. Similarly, although Dr. Urban did not testify, the jury heard evidence that his attorney approved his updating of the subpoenaed files. For example, Barbara Goodhart testified that Dr. Urban was openly writing on the subpoenaed charts and also talked about it openly, making clear that he believed that his lawyer approved. In sum, defendant has not met his burden of demonstrating that trial counsel erred in failing to present him as a witness on his own behalf or demonstrate the requisite prejudice.
Dr. Urban also argues that his counsel was ineffective in failing to present exculpatory documents from the medical board. These documents, filed in December 2000 with the motion for new trial, are policy statements interpreting R.C. Chapter 4731, the "Medical Practice Act." In the first document, the board expressed its concern that physicians were signing insurance forms for payment of services they did not personally provide. The board stated that, if the doctor's certification did not match his actual activities, there had been a violation of the Medical Practice Act. The board further stated that, if a physician stated that a service was a medical necessity without personal knowledge allowing such certification, a Medical Practice Act violation had occurred. In the other policy statement, the board explained that performing a pelvic examination constituted the practice of medicine but that a physician could delegate "specific technical components" of the examination, such as obtaining a pap smear, "to nurses or physician's assistants if within their scope of practice." (Motion for New Trial, Exhibit 1A.)
We note, first, that these statements were not interpreting the Medicaid laws under which Dr. Urban was billing ODHS, and, therefore, the statements were not relevant to the accusation at trial, which was that Dr. Urban billed for Ms. Fabian's services using a Medicaid code for services provided by a registered nurse or physician's assistant, which he knew was untrue. Second, it is debatable whether the documents support Dr. Urban's innocence. On the contrary, his actions could be viewed as violating the policies. We find that trial counsel was not deficient in failing to present these documents as a defense to Medicaid fraud.
In addition, Dr. Urban argues that his trial counsel committed a serious error in failing to retain an expert to testify that all the tests billed to Medicaid were medically necessary. He asserts that an expert would have testified as to the medical necessity of the tests. We note, however, that, in the post-trial proceedings, when the trial court expressly invited defendant to bring in an expert witness, and gave an extension of time to obtain witnesses to support the motion for new trial, defendant presented no witness. In the time provided prior to the hearing, an expert could have reviewed two or three patient files selected by Dr. Urban, and testified as to the medical necessity for the tests, thus providing a sample of the kind of expert testimony that, Dr. Urban alleges, a diligent and prepared attorney would have presented at trial. However, no expert testified, and Dr. Urban's assertions that an expert would testify that the tests were necessary are speculative.
Dr. Urban further argues that Mr. Colucci failed to object to double hearsay in the following testimony by Dr. Cooper:
 * * * [W]hat happened is that I said: No, I don't want these tests ordered before I have seen the patient, because I don't think that morally, or whatever, you can order tests prior to patient being seen. And when I was told that I was told that those tests were to be ordered and that the medical staff had been instructed by Dr. Urban that if they did not order these tests that they would not make enough money to run this business and then nobody would get paid. [Tr. 525.]
Instead of objecting to this testimony, Mr. Colucci proceeded to show that Dr. Cooper was one of those people being paid:
Q. And you're finding that out today, right?
A. Well—
Q. You have to get paid?
A. Yes, you do. * * * [Tr. 526.]
Mr. Colucci then elicited an admission from Dr. Cooper that, despite all her alleged concerns, she "still took the paycheck" and "still stayed there" and "came back time after time." (Tr. 528.) The witness admitted that she had returned to Dr. Urban's office for other temporary assignments because it was close to her family and was a pleasant place to work, although she could not justify it now. The witness further admitted that she could not testify as to what is or is not Medicaid fraud, and that she did not have an opinion as to whether it was a crime how Dr. Urban was operating his office.
We conclude that an objection to the first-quoted passage (about alleged instructions to the staff) would not necessarily have been successful, given that the reported statement was made by Dr. Urban, a party, and that one could argue that the employees were speaking as agents of Dr. Urban. However, even if we accept arguendo that an effective attorney would have moved to strike as well as challenged a witness's credibility, we cannot say that the absence of a request to strike affected the outcome.
Dr. Urban also contends that, when Mr. Colucci said "you have to get paid," counsel's statement was "nothing short of an assertion, made by his own defense attorney, that Defendant Urban was guilty of Medicaid fraud." (Defendant-appellant's brief at 28.) We disagree. The context shows that counsel was attempting to show that Dr. Cooper herself was being paid to testify and that her testimony, like her past conduct, was affected by self-interest, including monetary interest.
Dr. Urban further faults trial counsel for bringing out, on cross-examination, accusations made against him that were not relevant to the trial issues. Although we recognize that plausible theories of defense can be forwarded for some of counsel's forays on cross-examination, and that clarifications or cautionary instructions were given in several instances, we agree that some of the questions, comments, and characterizations by defense counsel were questionable. Nonetheless, we conclude that defendant has not proven that it is reasonably probable that the verdict would have been different absent counsel's mistakes and omissions.
First, we cannot agree that "no defense" was presented for Dr. Urban. Several members of Dr. Urban's staff, who might have been called in his defense, were called by the prosecution to establish parts of its case, and, accordingly, their beneficial testimony was elicited on cross-examination by defense counsel. Further, on appeal, Dr. Urban has not proved that trial counsel failed to call witnesses whose testimony would likely have resulted in his acquittal. For example, he asserts in his brief that he employed other temporary doctors who did not testify at trial and who, therefore, apparently approved of his protocol and found that the tests were medically necessary. However, he did not present the trial court with an affidavit post-trial from any of these doctors to demonstrate that they had crucial testimony to offer. Even when the court invited the defense to provide a witness in the post-trial hearing, the defense did not put on a witness to help demonstrate that, if that witness had testified during trial, there would likely have been an acquittal.
Although Dr. Urban presented affidavits in the post-trial hearing from his wife and several employees regarding counsel's approval of "grooming" the files, we cannot conclude that the testimony of these witnesses, if they testified at trial, would likely have resulted in a different outcome as to evidence tampering. These witnesses did not appear at the hearing, and there was no cross-examination as to their fairly vague statements in the affidavits, which do not directly and specifically refute Mr. Bravo's testimony at hearing. Their statements were generally consistent with his statements that he approved adding some materials to the files and reviewing the files for misfiled papers. More importantly, accepting arguendo that effective counsel would have interviewed these witnesses and presented one or more of them during trial, we nevertheless conclude that the evidence against Dr. Urban was so overwhelming that a different result was not likely upon retrial.
In reaching our conclusion that defendant was not deprived of his constitutional right to a fair trial and to counsel, we note that the issue of ineffective assistance of counsel is before us in an unusual procedural posture. On direct appeal of a criminal conviction, it is rare that we have in the record a motion for new trial based on ineffective assistance of counsel and rare that the trial court has held an evidentiary hearing and oral argument on the issue. Here, the trial court granted defendant leave to file new evidence to prove his claim of ineffective assistance of counsel and also held a hearing on the matter.
The trial court denied a new trial on all grounds, including ineffective assistance of counsel. We note that the trial court saw and heard all the attorneys and witnesses at trial, and heard all the testimony as it was presented to the jury in the courtroom. The trial court was able to assess counsel's performance first hand during the ebb and flow of trial. During trial, the court was in a position to judge the cumulative effect of counsel's representation. After trial, the court was able to evaluate the credibility of witnesses who testified as to ineffective assistance of counsel. The court saw and heard the testimony of Mr. Bravo and could assess the potential influence of self-interest in his testimony. The court also had ample opportunities to observe Dr. Urban and could assess the potential influence of self-interest on his testimony and whether the court should grant a new trial based on the doctor's post-trial assertions. Further, the trial court could assess the statements of Mrs. Urban and his employees, and determine whether a new trial should be granted on the basis of their post-trial affidavits.
In denying a new trial, the trial court implicitly accepted much of Mr. Bravo's testimony and implicitly rejected some assertions in the post-trial affidavits, assessments that we have no basis to disturb. We note that, given the posture of this issue, we have reviewed the question of ineffective assistance of counsel using two different standards of review. We have not only reviewed the record independently, concluding that defendant has not satisfied the two elements required, but we have also reviewed the trial court's denial of a new trial for ineffective assistance of counsel, and we conclude that the trial court did not err, or abuse its discretion, in denying the motion.
In reviewing the denial of the motion for new trial, we note the trial court gave careful consideration to the overall fairness of the trial. For example, the trial court considered Dr. Urban's situation, which was not that of an uneducated defendant with a court-appointed counsel he did not choose:
 * * * You got this example of these two fine lawyers and how lawyers should work. Then you come into court alleging that Mr. Colucci hadn't done anything. You didn't seem very shy about firing lawyers at any point in this proceeding or at least changing these attorneys * * *. You are an educated man and you have had an example of * * * the way lawyers should behave and yet you allege Mr. Colucci wasn't behaving that way, and yet you say nothing to anybody. * * * [Tr. 27-28.]
The court particularly noted that Dr. Urban had consulted with excellent attorneys during the course of the Grand Jury investigation. The record also shows that Dr. Urban worked with attorneys during his previous Medicaid audits, and that his brother was a lawyer who rendered services for the doctor's office. The trial court also heard Mr. Kluge's arguments regarding Dr. Urban's inexperience with criminal trials. We conclude that the trial court, in denying a new trial on grounds of ineffective assistance of counsel, reasonably considered the defendant's education, his experience with lawyers and legal matters, his ability to hire counsel of his choice, and his past exercise of the freedom to hire new counsel.
During the post-trial hearing, the trial court also observed that Mr. Merkle's representation of Ms. Hatcher had inured to the benefit of Dr. Urban in numerous ways. We agree that Mr. Merkle made objections and presented witnesses that benefitted Dr. Urban, and we conclude that the trial court, in considering the fairness and reliability of the trial, reasonably considered the overall assistance received by defendant during trial.
The transcript demonstrates that the trial court took care to safeguard the integrity of the trial and to ensure that it was fair. After trial, the court gave thorough attention to the motion for new trial. In addition, in denying a new trial, the court indicated that the evidence against Dr. Urban was very strong. For example, the court commented that Dr. Urban had engaged in "systematic efforts" to hamper the investigation.
We conclude that, even though there were flaws in counsel's defense of Dr. Urban, defendant has not met his burden of proving that it was reasonably likely that there would have been a different result absent the errors. The testimonial evidence and documentary evidence were overwhelming in combination. Accordingly, we conclude the trial court did not err or abuse its discretion in denying the motion for new trial on the grounds that counsel was constitutionally ineffective. We also conclude, separately, upon independent review of the record, that defendant has not met his burden on appeal of demonstrating that the outcome of his trial would probably have been different absent the errors and omissions by his trial counsel, considered in their totality. Defendant's first assignment of error is, therefore, overruled.
Plaintiff's motion to strike defendant's reply brief and defendant's response thereto were submitted to the court with the merits of this appeal; however, this motion was not supported by oral argument and is denied.
For the foregoing reasons, all six of defendant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Motion denied; judgment affirmed.
BROWN and BRYANT, JJ., concur.